ELLEN T. WINDOM and Others v. ALMON C. BROWN and Others.[1]

July 7, 1896.

Nos. 9962—(193).

**Lost Instrument—Sufficiency of Evidence.**

> Evidence *held* sufficient to establish the execution, loss, and contents of a certain written instrument.

Appeal by plaintiffs from a judgment of the district court for Hennepin county, entered in pursuance of the findings and order of Smith, J. Affirmed.

*Morphy, Ewing, Gilbert & Ewing*, for appellants.

*Chas. G. Laybourn, Cross, Hicks, Carleton & Cross*, and *Marshall A. Spooner*, for respondents.

[1] Reported in 67 N. W. 1028.

BUCK, J.   This is an appeal by the plaintiffs from a judgment of
the district court of Hennepin county, entered in an action commenced.
by one of the plaintiffs as widow and the surviving children of Wil-
liam Windom, deceased, to quiet title to the N. W. ¼ of section 3, in.
township 118, range 22, in Hennepin county, Minnesota.   The action in.
form is one to determine adverse claims.   Almon C. Brown and wife-
were made principal defendants, and the other defendants, of whom.
there are a large number, are either judgment creditors of Brown, or
persons who were supposed to hold liens upon the property in question,.
or on such interest as Brown had therein, by virtue of mortgages there-
on executed by Brown and his wife.   The only defendants who an-
swered in the case were S. E. Neiler, to whom a mortgage was given.
by Brown upon his interest in the land for the benefit of the Union.
National Bank, of which Neiler was president, and Otto E. Naegele,.
who was a judgment creditor of Brown, claiming a lien upon Brown's
undivided interest in the land.

During the pendency of the action, Lewis C. Spooner intervened
therein, and claimed to be the equitable owner of an undivided one-
sixth interest in the land; that, before the death of Windom, he made
a contract with Almon C. Brown, but in fact with the firm of Spooner-
& Brown, composed of Lewis C. Spooner, Almon C. Brown, and one
Rhone, which contract provided that whereas certain claims had been.
made against said lands by other parties on account of certain tax
titles, if said Brown should, in behalf of Windom, institute and prose--
cute such litigation as might be necessary to remove from said lands.
the cloud of said tax titles, he (Brown) should have a conveyance of an.
undivided one-third interest in and to said lands; and that said con-
tract, although in the name of Brown, was, in fact, understood by all
parties, including Windom, to have been made with the firm of
Spooner & Brown.

The trial court found as facts that a contract in writing did exist
between Windom and Spooner & Brown, in the name of Brown, as set
forth in the intervenor's complaint in the action; that Spooner &
Brown had in all respects completely performed all the terms of said
contract in and so far as they were concerned; that they had become
fully entitled to a conveyance of an undivided one-third interest in the
land; that such interest had in fact been divided between the mem-
bers of the firm of Spooner & Brown, and should be divided between.

them so that Spooner and Brown should each have an undivided one-sixth interest therein; and the court ordered that judgment should be entered accordingly in their favor. But, by the same order, the court directed that judgment be entered establishing the interest and right of the Union National Bank, and of Otto E. Naegele, and made these claims liens upon the undivided one-sixth interest of Brown, but ordering and establishing the judgment held by Naegele as a paramount and superior lien on Brown's interest; the judgment having been entered and docketed prior to the accruing of any other liens. After the entry of the judgment according to the order of the trial court, the plaintiffs took this appeal.

We do not deem it necessary to enter into an analytical discussion of the evidence upon which the trial court based its finding of facts as to existence of the contract between Windom and Brown. That there was a contract, either oral or in writing, seems beyond any reasonable controversy; and that it was fully performed on the part of Brown or Brown & Spooner, by their successful litigation in favor of Windom, is quite conclusive; and nowhere does it appear that Windom ever actually paid for these legal services performed in his behalf. This fact gives force to the contention of the defendants that the payment for such services was to be made by Windom's conveying to Brown, or the firm of Brown & Spooner, an undivided one-third interest in the land described in the complaint. That such contract was in writing, as found by the trial court as a fact, seems to be supported by ample evidence, and we decline to disturb such finding. The only legal questions which we need discuss arose at the trial as to the sufficiency of the preliminary proof offered to show the loss of the written contract, and the admission of secondary evidence as to the contents of the contract.

The original written contract between Brown and Windom could not be found and produced as evidence on the trial. It appears that this contract was made in the latter part of the year 1885, or early part of the year 1886, and the business to which it related was successfully completed by Brown & Spooner before August 1, 1888. Windom died about February 1, 1891, and neither the contract nor a copy thereof could be found among his papers. Brown & Spooner were practicing attorneys, with their office located in Minneapolis; but Brown left there about November 1, 1889, and, during the succeeding

few years, resided at several other different places. He appears to have been a man of a roving disposition, either insolvent or indifferent as to the payment of his debts, and careless in keeping his papers. Soon after leaving Minneapolis, many of his books and papers were shipped to him at Washington, D. C., where Mrs. Brown, wife of Almon C. Brown, testified that she saw this contract in question in his possession, in 1890, and there heard him read it. Brown's papers not shipped to him at Washington were turned over to Mr. Cahaley, of Minneapolis. Mrs. Brown also testifies that she saw the contract afterwards, in the hands of Edward A. Sumner, at his residence in New York City, who had it among other papers which he had taken from the hotel at Waterbury, Connecticut, where Brown had left his grip as security for his board bill, as Mr. Sumner had paid the bill, and taken the papers, and held them also for money loaned Brown. Sumner was a practicing lawyer in New York City, and formerly knew Brown in Minneapolis, and befriended Mrs. Brown while she had a sick child and was without funds. He testifies that, to the best of his recollection, he never had the contract in his possession, and he could not tell where it was, and that Mrs. Brown took from the papers in the grip such ones as she wished. Mrs. Brown was unable to find the contract or tell where it was. Cahaley, with whom part of Brown's papers were left, testified that he had made diligent search for the contract among his papers, and those left with him by Brown, and could not find it. About February 9, 1893, Brown left the city of New York, and went to the city of Duluth, in this state, from which place he wrote his wife, stating that he was going out from under the jurisdiction of the old flag, and very likely would never return again, since which time she has not heard from him, and his whereabouts are unknown to her or parties connected with this action.

It seems to us that the defendants used all diligence and reasonable exertions to find this contract. The law does not require impossibilities. The parties in whose possession it was last seen could not find it. For its loss the defendants were in no way accountable. Brown himself was undoubtedly beyond the jurisdiction of the court, and his whereabouts entirely unknown to the defendants or to any one else, so far as appears by the evidence. There was no suspicion that it had been purposely destroyed, and its nonproduction was accounted for by reason of the defendants' inability to find it. The

search for it seems to have been made in good faith, and to the extent which the nature of the case admitted. When the making of the contract was duly proved, and its loss established by competent evidence, then, as a matter of legal right, the defendants were entitled to prove its contents by parol testimony.

The sufficiency of the evidence to establish the contents of the contract as alleged by the defendants is assailed by the plaintiffs. It is doubtless the rule that, when a written contract is lost or destroyed, its contents can only be established by parol evidence that is reasonably clear and certain. The instrument itself is the highest grade of evidence of its contents, and, in case of loss or destruction, only the highest grade of secondary evidence obtainable will answer the requirements of the law. This is the only safe rule, but an exact literal proof of its contents is not absolutely necessary. Evidence showing the substantial formalities required by law necessary to have made the lost instrument effective is required, especially where it affects the title or right in or to real estate.

F. E. Goddard, a witness sworn in behalf of intervenor, testified as follows:

"Q. Now, do you know how that business or litigation was undertaken by the firm of Spooner & Brown, whether it was under a written agreement or otherwise? A. It was undertaken through a contract with Mr. Windom. Q. Was that contract oral or in writing? A. Writing. Q. Have you seen that contract? A. Yes, sir. Q. When did you see that contract? A. I saw it in the year 1886. Q. Were you at that time acquainted with the signature of William Windom? A. Yes, sir. Q. Do you know whether his signature was appended to that contract? A. Yes, sir; it was. Q. Do you know whether or not that contract related to the land involved in this action, which is the northwest quarter of section three, township one hundred and eighteen, range twenty-two, in Hennepin county, Minnesota? A. It was. Q. What were the terms of that contract? A. The terms of the contract were that Mr. Brown was to go on and commence suit, and clear the title of its defects, in Mr. Windom's name, and he was to have one-third interest in it. Mr. Spooner: Was to have one-third interest in the land, and, if he succeeded in clearing the title, what was Mr. Windom to do, if anything? A. He was to convey one-third interest to Mr. Brown for his services. Q. That contract was made in A. C. Brown's name? A. Yes, sir. Q. Do you know whether or not the expense of that litigation was paid by the firm of Spooner & Brown, or by Mr. A. C. Brown? (Objected to, as not the best evidence.) The Court: Answer it 'Yes' or 'No.'

A. The expenses were all paid by Mr. Brown. Mr. Spooner: Answer it 'Yes' or 'No,'—whether you know or not. You do know? A. Yes. Q. Were they paid? A. Yes, sir; they were paid."

Cross-examination:

"Q. You saw a contract, you say, in 1886, in which Mr. Brown was to take certain proceedings to clear the title of certain lands? A. Yes, sir. Q. Where did you see that contract? A. I saw it in Mr. Brown's office. Q. At what time in 1886? A. Well, I presume about the middle of the season, in June. Q. June, 1886? A. Or earlier than that; I could not state just what time; some time during that spring. Q. Did you see more than one contract between Windom and Brown? A. Mr. Brown, I think, had two or three contracts with him. Q. Did you read them all over carefully? A. I have had Mr. Brown read them to me. He talked considerably to me about the matter at that time. Q. You heard Mr. Brown read them, but you never read them yourself? A. I could not state that."

W. H. McDonald, a witness for intervenor, testified as follows:

"Mr. Brown offered me a contract for security, signed by Windom and himself. Q. I wish you would tell us what that contract contained. (Objected to, as incompetent, irrelevant, and immaterial, and not the best evidence. Overruled. Exception.) A. As I remember the contract, it was a contract with Mr. Brown to clear up the title to a piece of land in Hennepin county, and he was to have a one-third interest when the title was perfected from Windom. Q. Did you have occasion to examine that contract? A. I did. Q. It was in some transaction between yourself and Brown that you did examine that contract in reference to taking the security? A. Yes, sir. Q. You were acquainted with the signature of Mr. Windom? A. Yes, sir. Q. Was that signed by William Windom? A. Yes. Q. Do you know the signature of A. C. Brown? A. I did; it was signed by A. C. Brown."

Cross-examination:

"Q. Do you remember anything else about the contract than it refers to some Hennepin county land? A. I remember that Mr. Brown was to have one-third interest. He was to go on and complete that litigation; go on and perfect the title in Mr. Windom, and pay expenses. * * * Q. Do you remember how the parties were described? A. Windom was described as the party of the first part, and Brown as the second party. Q. You don't remember any other terms of the contract except what you have stated? A. That is true. I perhaps could give some more of the conditions. The contract went on and recited that this land was claimed by other parties, and the tax titles were to be cleared up, and the title straightened."

Re-examination:

"By Mr. Spooner:    Q. And there was an assignment attached to that contract?    A. There was; it was an assignment by Brown to L. C. Spooner of one-half of his interest.    Q. There was an assignment by Brown to Spooner of half interest?    A. Attached to it, undivided one-half of Brown's interest.    Q. Do you remember how that assignment was attached?    A. I think it was fastened with some brass fasteners or stamp; I don't remember.    I know it was on the back of the contract."

Charles W. Rhone, sworn in behalf of intervenor, testified as follows:

"Q. Did you have any business with William Windom in connection with any land in Hennepin county?    A. There was a contract that the firm had, or rather Mr. Brown assigned the contract (it was a firm matter); a certain contract which Mr. Brown had personally made with Windom, with reference to certain lands in this county. * * *    Q. This particular contract to which you refer as being between Windom and the firm of Spooner & Brown was in the name of A. C. Brown.    Do you know whether it was signed by Windom?    A. It was.    Q. Were you acquainted with his signature?    A. I was acquainted with his signature.    I had seen it in various letters and various contracts.    Q. Was William Windom around your office much?    A. I have personal recollection of his being in there several times; three or four times; maybe half a dozen times.    Q. What was the firm name on the door?    A. Spooner & Brown.    Q. Did you have any correspondence with William Windom?    A. Yes.    Q. Did you use the firm's letter heads?    A. Yes; on the letter heads was the firm name of Spooner & Brown, and the individual members of the firm.    Q. This contract, signed by William Windom, is also signed by whom?    A. The contract, as I recall it, was between William Windom and A. C. Brown, signed by each as individuals.    Q. Tell us what the contract provided.    What were its terms?    A. As I recall the contract, it provided that Mr. Brown should bring certain actions in reference to this land in regard to tax title, to reclaim the title.    He was to have a percentage interest, and, as I recall it, it was one-third.    That is the best of my recollection."

Cross-examination:

"Q. You remember particularly of seeing the agreement that you testified to?    A. Yes, sir; I read it at the time, as it was a firm matter.    Q. That was an agreement between Windom and the firm of Brown, Spooner & Rhone?    A. I do not so recall it.    My recollection is that it was an agreement between Windom and A. C. Brown.    Q. When was it that you saw it?    A. I could not say positively; could only give you the date approximately.    It was in the fall of 1885, or early in the winter of 1885; but I think, to the best of my recol-

lection, in the fall of 1885. Q. Where was it that you saw it? A. In the office of Spooner & Brown, Boston Block. Q. You are sure that property was in Hennepin county? A. Yes. Q. Was that agreement witnessed and acknowledged? A. I could not swear to that. My recollection is it was, but I could not positively swear to it. Q. You are not positive about that being signed? A. Yes. Q. That the signatures were original? A. Yes; I am positive about that. Q. It could not be a copy of the agreement? A. Mr. Brown's signature was original, and the signature of Mr. Windom, if it was a copy, was a very good forgery. Q. Will you swear that that was the original agreement? A. I am perfectly willing to. Q. What makes you willing to do that? A. Because that is the best of my recollection. Q. That is the reason? A. Yes, sir. Q. At this time, do you feel confident that that signature attached to that agreement was Windom's? A. Yes. Q. What makes you confident of that? A. When it became a firm matter, I had a sufficient interest to know whether it was an original, or whether it was a copy; and I think it was in my possession quite a while, among other contracts and papers of the firm, and in the firm's safe. Brown had a personal safe of his own. Q. You had it in your safe because it was a firm matter? A. Yes, sir. Q. You say you put it in your safe? A. It was in the firm safe, in the safe of Spooner & Brown. Q. You knew the firm was interested in the contract? A. Not when it was originally made; no, sir. It was understood it was to be a firm matter. Q. How long did you keep it in the safe of the firm? A. I think until the dissolution of the firm of Spooner & Brown,—until the firm went out of business, some time in June, 1886. Q. You only saw it once, you say? A. I never read it but once, but I think it was in my possession several months. Q. You seem to be sure it was signed by Mr. Windom on account of your being interested in it? A. Yes, sir."

The intervenor, Spooner, who was a member of the firm of Spooner & Brown, testified that he knew the parties Brown and Windom; that he was interested in the contract, and his recollection was that he had seen it on two different occasions; that he advanced money to the firm to redeem land described in the contract from tax titles; that he knew Windom's handwriting as well as that of Brown.

We think there was sufficient evidence to establish the contents of the contract as claimed by the defendants, as well as the assignment by Brown to Spooner of an undivided one-sixth interest therein.

There was no error in the admission in evidence of Exhibit 3, being the contract between Brown and Spooner, wherein it was agreed that Spooner was entitled to have and receive an undivided one-half of Brown's one-third interest in the land described in the contract between Brown and Windom.

65 M.—26

It was admissible to show Spooner's right in the original contract, and to establish his one-sixth interest, as against Brown's or those claiming under him.

Judgment affirmed.